# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Donnie Jones, #318400, | ) | Civil Action No. 9:14-0338-DNC-BM |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| David McCall, Gwendolyn Stokes, Willie | ) | |
| Davis, Franklin Richardson, Jr., Stephanie | ) | |
| Brown, Sandra Jones, Warden Robert M. | ) | |
| Stephenson, III, and All Employees of | ) | |
| South Carolina Department of Corrections, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

This action has been filed by the Plaintiff, pro se, pursuant to 42 U.S.C. § 1983. Plaintiff, an inmate with the South Carolina Department of Corrections, alleges violations of his constitutional rights by the named Defendants.

The Defendants filed a motion for summary judgment pursuant to Rule 56, Fed.R.Civ.P. on September 3, 2014. As the Plaintiff is proceeding pro se, a Roseboro order was entered by the Court on September 5, 2014, advising Plaintiff of the importance of a motion for summary judgment and of the need for him to file an adequate response. Plaintiff was specifically advised that if he failed to respond adequately, the Defendants' motion may be granted, thereby ending his case.

Plaintiff did not thereafter file a response, and a Report and Recommendation was entered by the Court on December 10, 2014, recommending that this action be dismissed with



1

prejudice for failure to prosecute. However, Plaintiff filed a belated response in opposition to the Defendants' motion on December 16, 2014, and the undersigned therefore vacated the Report and Recommendation. Defendants' motion for summary judgment is now before the Court for disposition.[1]

## Background and Evidence

Plaintiff alleges in his verified Complaint[2] that he is an inmate with the SCDC, who during the time period relevant to his claims was (apparently) housed at the Lee Correctional Institution, and then the Broad River Correctional Institution.[3] Plaintiff alleges that the Defendants were deliberately indifferent to his serious medical needs by failing to provide him with prompt and proper treatment for a "large gash" in the middle knuckle on his left hand, which resulted in his wound becoming severely infected.

Specifically, Plaintiff alleges that on January 25, 2013 he badly injured his left hand when he hit a door because he was angry. Plaintiff alleges that his injury was approximately one inch long, and all the way to the bone. Plaintiff alleges that he was never seen by anyone in medical for this injury until February 1, 2013, even though the security staff had called medical about his injury. Plaintiff alleges that by the time he was seen on February 1, 2013, he was told by Dr. "Drago" that, although his hand needed stitches, he could not put any in because it had been "too

---

[1]This case was automatically referred to the undersigned United States Magistrate Judge for all pretrial proceedings pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(d) and (e), D.S.C. The Defendants have filed a motion for summary judgment. As this is a dispositive motions, this Report and Recommendation is entered for review by the Court.

[2]In this Circuit, verified complaints by pro se prisoners are to be considered as affidavits and may, standing alone, defeat a motion for summary judgment when the allegations contained therein are based on personal knowledge. Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991).

[3]The docket of this case reflects that Plaintiff is currently housed at the Lieber Correctional Institution.



long" (seven days).  Plaintiff alleges that Drago ordered bandages for his injury, and told him "he hoped it would heal properly".  Plaintiff alleges that requested to have his hand x-rayed, but that this request was refused.

Plaintiff alleges that his hand "continued to get worse", and that several staff members called medical with this information.  Plaintiff alleges that he was told to sign up for sick call, which Plaintiff alleges "at that time took weeks to be seen".  Plaintiff alleges that even though his hand was "bleeding and leaking" continuously, the nurses who saw it daily when they were passing out medication refused to treat it, stating that they were "only [the] pill line nurses".  Plaintiff alleges that although he did receive some bandage changes "at night", medical staff always made excuses for "fail[ing] to act", such as that the doctor was out or they did not have a nurse practitioner present.  Plaintiff alleges that the Defendant Gwendolyn Stokes (the head nurse) told the Defendant McCall (the Warden at LCI) that Plaintiff was "healed", even though he was not, and that he eventually had to be hospitalized twice and had to have surgery due to a severe infection in his left hand.  Plaintiff alleges that in the process he lost partial feeling and movement in three of his fingers, and that he was forced to live with severe pain for over two months.

Plaintiff then sets forth some particulars about his condition and attempts to obtain treatment.  Plaintiff alleges that on February 5, 2013, the Defendant Nurse Stephanie Brown told him that she would not waste her "valuable medical time" treating the Plaintiff, because his injury was self inflicted.  Plaintiff alleges that on February 11, 2013, SCDC security would not allow the nurse to change his "blood soaked bandage" because of a lack of security staff, and that he was forced to stay in this bandage for over twenty-four hours.  Plaintiff alleges that on February 13, 2013 he spoke to both the Warden and the Deputy Warden (the Defendant Willie Davis), who both said they would get Plaintiff to medical, but Plaintiff was not seen.  Plaintiff alleges he was again refused



3

a bandage change due to "a security shortage" on February 14, and February 15, 2013. Plaintiff alleges the nurse told him to just remove his bandage, following which Plaintiff's hand was unbandaged for over twenty-four hours. Plaintiff alleges that on February 25, 2013, the nurse took a tissue sample, following which he was advised on March 2, 2013 that he had a "bad staff infection". Plaintiff alleges that on March 11, 2013, a blood technician who was checking his blood levels for his mental health medication told him he needed to be on antibiotics, following which he was seen by Nurse Anna Smoak on March 12, 2013. Plaintiff alleges Nurse Smoak numbed his hand and lanced it. Plaintiff again requested x-rays, which were performed the following day. Plaintiff alleges that these x-rays showed a sliver of metal that had come off the door when he hit it, and which had been in his hand for over two months, causing an infection.

Plaintiff alleges that on March 15, 2013, the Defendant Nurse Sandra Jones told the Lieutenant (apparently the Defendant Franklin Richardson) that Plaintiff's bandages needed to be changed, but that the Lieutenant said they were short of security at that time. Plaintiff alleges that on March 16, 2013 he went on a hunger strike to get treatment for his hand. Plaintiff alleges he was seen for his hunger strike on March 18, 2013, at which time his hand was swollen 3 times bigger than normal. Plaintiff alleges he was sent to Richland Memorial Hospital, where he was put on antibiotics and given an IV. Plaintiff was also provided with pain medication, "morphine every 2 hours and oxycodine every 4 hours". Plaintiff alleges his arm was also put in a cast.

Plaintiff alleges the hospital removed his cast on March 21, 2013, after his swelling had started to go down, at which time he realized he could not move three of the fingers on his had. Plaintiff alleges he had very little feeling, while movement was severely restricted, and that he was told to wear a wrist and arm brace. However, Plaintiff alleges that a "Lt. Davis" refused to let him wear the brace (which was to keep his wound from breaking open again) during transportation back



to the prison, and that by the time they got back to the prison his wound was "broken open and bleeding again". Plaintiff alleges that his infection returned, and that on March 28, 2013 prison staff took pictures of his hand and arm in order to document the shape it was in. Plaintiff alleges that the nurse at the Broad River Correctional Institution recommended on April 4, 2013 that he be seen by an orthopedic surgeon. On April 17, 2013, Plaintiff was seen by Dr. "Voss", who said he needed surgery.

Plaintiff alleges he was thereafter admitted to Richland Memorial Hospital on April 18, 2013, and that surgery was performed on April 19, 2013, during which his wound was cleaned and a sliver of metal was removed from his hand. Plaintiff alleges that he almost immediately started to get better. Plaintiff further alleges, however, that even though Dr. Voss recommended post-surgery that he receive physical therapy, that he did not see a physical therapist for months. Plaintiff alleges that (at the time of the filing of the Complaint) he had only seen a therapist twice in almost ten months, and that although he was given "a big 4 foot long rubber band" to perform therapy with, SCDC staff confiscated this rubber band as soon as he returned to the prison.

Plaintiff alleges that the Defendants McCall and Davis are liable in this action because they knew of Plaintiff's need for medical attention when he was at LCI and failed to see that he got the medical attention he needed. In the amendment to Plaintiff's Complaint, Plaintiff alleges that the Defendant Robert Stephenson, Warden at BRCI during the relevant time period, also knew of his need for medical attention via staff requests and personally seeing Plaintiff's injury, and that Stephenson also failed to ensure that he got proper medical attention. Plaintiff alleges that the Defendant Lt. Franklin Richardson knew he had a serious medical need for medical care and failed to take the proper steps to ensure that Plaintiff was seen by medical personnel as needed. Finally, Plaintiff alleges that the Defendant Nurses Brown, Jones, and Stokes all knew of his medical



condition and needs and failed to provide him with adequate care and treatment.  Plaintiff seeks adequate medical care and treatment, as well as monetary damages for violations of his constitutional rights.  Plaintiff has attached to his Complaint copies of various grievances he filed relating to this matter, as well as a "declaration" wherein he reiterates the claims made in his Complaint.  See generally, Verified Complaint, with attached exhibits.

In support of summary judgment in this case, the Defendants have submitted several affidavits as well as copies of extensive medical records detailing Plaintiff's medical care.  The Defendant Gwendolyn Stokes has submitted an affidavit wherein she attests that she is a registered nurse assigned to LCI.  Stokes attests that she is a nursing supervisor, and as such primarily supervises the activities of the Medical Department.  She does not normally see patients.  Stokes attests that sick call is conducted four days a week in the Special Management Unit (SMU)[4] - Monday, Tuesday, Wednesday and Thursday - and that inmates are also seen for emergencies on Friday, Saturday and Sunday.  Stokes attests that inmates sign up for sick call, and that these sick call requests are then provided to the Medical Department.  The Medical Department then provides a list of inmates who need to be seen and they are seen in the medical area in the SMU.  Additionally, medications are delivered in the MSU seven days a week, three times per day.  Some of these medications are "observed" medications, meaning that the nurse must observe the inmate taking the medications.

Stokes attests that delivering medications is a time consuming process, which is made even more complicated and time consuming due to the security requirements in the SMU, so that when delivering medications to inmates in the SMU, medical personnel do not provide treatment

---

[4]During the time period relevant to Plaintiff's claims, he was housed in the SMU at LCI, and then at BRCI.

6



to inmates or do detailed examinations. Stokes attests that a large portion of the inmates will often want to discuss their medical issues with the nurses delivering medications, but that medical personnel inform these inmates that they are there to provide medications only and not to discuss medical issues or provide medical care at that time. Stokes attests that some medications must be delivered at a certain time, and that personnel simply cannot stop to discuss medical issues, or examine or provide any type of treatment to the inmates, although if these medical personnel do see an emergency situation, they will certainly provide medical care. Furthermore, Stokes attests that if medical personnel observe an issue that needs to be addressed, they will notify appropriate medical personnel so that the inmate can be seen.

Stokes attests that she recalls that Plaintiff had an injury to his hand, although she does not recall, nor does she see any indication in Plaintiff's medical records, that she ever examined the Plaintiff. Stokes attests that, based on Plaintiff's medical records, medical personnel first became aware of Plaintiff's injury on January 31, 2013, when they received a phone call from an officer in the SMU stating that Plaintiff reported his hand was hurting and was bleeding. Stokes attests that Plaintiff was seen by medical personnel the following day, at which time he reported that he had hit his window approximately one week prior. Stokes attests that Plaintiff's left middle knuckle was split open and was swollen, and that his wound was cleaned, antibiotic ointment was applied, and a bandage was put in place. Plaintiff's bandage was also changed again later that evening, after Plaintiff stated that it had fallen off.

Stokes attests that Plaintiff was seen again on February 2, 2013 at which time his wound was cleaned and the dressing changed. The following day, February 3, the Plaintiff informed the nurse who was delivering the morning medications that his hand was in pain and had an odor, so Plaintiff was seen by a physician the following day, February 4, who cleaned and re-bandaged



Plaintiff's hand and prescribed an antibiotic. Plaintiff was also given a tetanus shot. Stokes attests that Plaintiff was seen on February 4, February 6 (a few minutes after midnight), and again on February 6 (that evening) for a dressing change.

Stokes attests that Plaintiff continued to be seen by medical personnel and have his wound cleaned and dressing changed, although there were several occasions when Plaintiff was not seen apparently due to staffing or security issues, and on at least one other occasion when Plaintiff refused to have his dressing changed. Stokes attests that in her opinion as a registered nurse, no harm resulted to the Plaintiff from his dressing not being changed for one or two days.

Stokes attests that on February 19, Plaintiff's wound was noted to have a white drainage present. He was seen again shortly after midnight on February 21, where this drainage was again present. When he was seen again late on February 21 for a dressing change, there was no active drainage or odor noted. Stokes attests that Plaintiff was seen again on February 26, at which time it was noted that he had removed his dressing, even though he had previously been instructed not to remove his dressing. Although no active drainage or foul odor was noted, there was a small amount of drainage at the wound site, and a wound culture was obtained. Plaintiff was thereafter seen again on March 3, at which time it was noted that Plaintiff's knuckle had scabbed over and he had no drainage. Plaintiff did not want a dressing, and it was determined he did not need one at that time.

Stokes attests that Plaintiff's laboratory results were received on March 4, which were positive for a staph infection. Plaintiff was seen by medical personnel on March 8, at which time his hand was noted to be red and swollen with a small amount of drainage, and he was provided with antibiotics to treat his staph infection. Stokes attests that on March 12, she spoke with security personnel, who informed her that Plaintiff's hand was red and swollen with some drainage, so she



instructed that Plaintiff be brought to the medical department to be seen by the nurse practitioner. Stokes attests that Plaintiff was seen by medical personnel that evening, although apparently not by a nurse practitioner. Plaintiff's records indicate that there was a verbal order to obtain an x-ray of Plaintiff's hand. Stokes attests that thereafter Plaintiff continued to be seen by medical personnel, was continued on his antibiotics, and was also given an intramuscular injection of Rocephin, which is another medication used to fight bacterial infection. That was on March 17.

Stokes attests that the following day, March 18, the nurse delivering medications observed that Plaintiff's hand was red, swollen and hot to the touch, so Plaintiff was sent to Palmetto Richland Hospital for treatment. Plaintiff's x-ray report was received the following day, which showed no fractures but that there was a foreign body over the dorsum of the third metacarpal. Stokes attests that this foreign body was not located in the area of the wound, but was more to the back side of Plaintiff's hand. Plaintiff thereafter returned to Palmetto Richland on March 21, where he was prescribed medications and scheduled to followup with the orthopedic surgeon. Plaintiff was then transferred to the BRCI on March 28. Stokes attests that she had no further involvement with Plaintiff's medical care after his transfer to Broad River, although based on his medical records Plaintiff did continue to receive medical care. Specifically, Plaintiff was seen by an orthopedic surgeon on April 17, 2013, who rendered a diagnosis of recurrent left-hand cellulitis and foreign body. Surgery was recommended, and Plaintiff's medical records reflect that surgery was performed on April 19. Stokes attest that Plaintiff's medical records reflect that he thereafter continued to be seen by medical personnel, and that the wound on his hand healed well. Plaintiff did continue to complain about pain in his hand and numbness in his fingers, so the orthopedic surgeon recommended that a nerve conduction study be completed. Stokes attests that the nerve condition study was completed on November 14, with the report stating that it was a normal study



9

with no finding of any electro diagnostic evidence of nerve damage.

Stokes attest that in her opinion Plaintiff received appropriate medical care, and that at all times in her dealings with the Plaintiff, she acted in accordance with generally accepted medical practices. Finally, Stokes also notes that, as a nurse, she does not have the authority to prescribe medications, order diagnostic testing, schedule an appointment with an outside medical provider, or send an inmate to the hospital, unless there is a clear medical emergency. See generally, Stokes Affidavit.

Defendant Stephanie Brown has submitted an affidavit wherein she attests that she is a licensed practical nurse (LPN) assigned to LCI, and that her duties include examining, treating, and providing medications for inmates. Brown attests to the same facts as did Stokes with respect to how medicine distribution to inmates in the SMU is handled. Brown attests that she does recall Plaintiff had an injury to his hand, but does not recall that any time observing the Plaintiff that he had an emergency condition which required immediate medical attention, but that if she had, she would have informed him to sign up for sick call to receive treatment. Further, if she had observed that Plaintiff had an emergency medical condition, she would have provided Plaintiff with medical care or contacted appropriate medical personnel to determine if Plaintiff needed to be sent to the hospital. Brown attests that at no time did she state to the Plaintiff that he would not be provided treatment because his wound was self-inflicted, as this would have no bearing on the treatment he received. Rather, Brown attests that she did not provide Plaintiff with immediate treatment because he did not have an emergency medical condition that required treatment at that time. Brown attests that at all times in her dealings with the Plaintiff, she acted in accordance with generally accepted medical practices, and that at no time did she intentionally take any action to deny Plaintiff proper medical care. See generally, Brown Affidavit.



10

The Defendant Sandra Jones has submitted an affidavit wherein she attests that she is a licensed practical nurse (LPN) assigned to LCI, and that one of her duties is to deliver medications to inmates housed in the SMU. Jones attest that she does not provide medical care or treatment to inmates while delivering medications, for the reasons previously discussed, but that if she sees an emergency situation, or she observes an issue that needs to be addressed, she will notify appropriate medical personnel. Jones attests that she recalls that Plaintiff had an injury to his hand, but does not recall at any time observing Plaintiff having an emergency condition which required immediate medical attention. Jones attests that sick call is held four days a week for inmates in the SMU, and that in her opinion Plaintiff could wait to be seen in sick call for his condition. Further, if Plaintiff had had an emergency medical condition, Jones attests that she would have provided Plaintiff medical care or contacted appropriate medical personnel to determine if Plaintiff needed to be sent to a hospital. Jones attests that at all times in her dealings with the Plaintiff, she acted in accordance with generally accepted medical practices, and at no time did she intentionally take any actions to deny Plaintiff proper medical case. See generally, Jones Affidavit.

The Defendant Franklin Richardson has provided an affidavit wherein he attests that he is a Lieutenant at LCI, assigned to the SMU. Richardson attests that he speaks with numerous inmates each day, and that as such he would likely have spoken with the Plaintiff on one or more occasions, although he does not have any specific recollections as to the nature of these conversations. Richardson attests that he specifically does not recall speaking with the Plaintiff concerning medical care for his hand, although he does routinely speak with inmates about issues relating to their medical care, and that if an inmate has an obvious medical emergency, he would take immediate action. Otherwise, Richardson attests that he would instruct the inmate to sign up for sick call. Richardson attests that in order for inmates in the SMU to be seen by medical



personnel there have to be two officers present to stay with the inmate while medical personnel are present, and that there have been situations where, because of staff availability, inmates may not be seen if medical personnel determine that they can wait to be seen the following day, although if an inmate needs to be seen by medical personnel, they will be seen.

Finally, Richardson attests that he does not have any advanced medical training, and relies on the expertise of the trained medical personnel to provide medical care to the inmates. He does not overrule the medical judgments of the trained medical personnel concerning the medical treatment provided to inmates, he is not directly involved in the medical care given to inmates, and he has no first hand knowledge concerning the medical care provided to the Plaintiff. Richardson attests that although Plaintiff is no longer housed at LCI, it is his understanding that Plaintiff was seen on multiple occasions and received appropriate medical care at LCI, and that at no time did he take any action to deny the Plaintiff proper medical care. See generally, Richardson Affidavit.

The Defendant Michael McCall has submitted an affidavit wherein he attests that he is currently the Deputy Director of Programs and Services with the SCDC, but that he was previously the Warden at LCI, where he was responsible for the overall operation of the prison. McCall attests that, as Warden, he received numerous requests from inmates (an average of 40 to 50 per day) on a variety of issues, and that he would also generally walk through different parts of the prison on a daily basis and speak with numerous inmates. McCall attests that while walking through the prison, it would not be uncommon for him to speak with thirty or more inmates in one day, and that although it is possible that he spoke with the Plaintiff, he has no specific recollection of speaking with him concerning the medical care he was provided, although inmates do routinely speak to him about issues related to their medical care.

McCall attests that if an inmate has an obvious medical emergency, he would have



taken immediate action, but otherwise he instructs the inmate to sign up for sick call. McCall attests that he does not have any advanced medical training and relies on the expertise of the trained medical personnel to provide medical care to all inmates. McCall attests that he does not overrule the medical judgments of the trained medical personnel concerning the medical treatment provided to inmates, and that it is his understanding that Plaintiff was seen on multiple occasions and received appropriate medical care while at LCI. Further, if he received at Request to Staff form from an inmate or spoke with an inmate concerning his medical care, he would generally refer the inmate to the medical department. McCall attests that at no time did he take any action to deny the Plaintiff proper medical care. See generally, McCall Affidavit.

The Defendant Willie Davis has submitted an affidavit wherein he attests that he is the Deputy Warden at LCI, where he supervises the SMU. Davis attests that the SMU is the highest security level and most secure area of the prison, and is used to house inmates who present a high security risk at a high security level. Davis attests that inmates are generally placed in the SMU because of disciplinary problems or assaultive or violent behavior, and that Plaintiff has an extensive disciplinary history and is housed in the SMU as a result of numerous disciplinary convictions.

Davis attests that he is generally on the "wings" in the SMU several times each day, during which he speaks with inmates to discuss concerns or issues they may have. Davis attests that he recalls the Plaintiff and likely spoke with him on one or more occasions, but that he does not have any specific recollection as to the nature of these conversations, including specifically with respect to the issue of medical care for Plaintiff's hand. However, Davis attests that he does routinely speak with inmates about issues relating to their medical care, and that if an inmate has an obvious medical emergency he would take immediate action, but otherwise he instructs the inmate to sign up for sick call. Davis attest that if an inmate needs to be seen by medical personnel, they will be seen, but



since in order to be seen by medical personnel SMU inmates have to have two officers present, there have been situations where, because of staff availability, inmates may not be seen right away if medical personnel determine that they can wait to be seen the following day.

Davis attests that he does not have any advanced medical training and relies on the expertise of the trained medical personnel to provide medical care to all inmates. Davis attests that he does not overrule the medical judgments of the trained medical personnel concerning the medical treatment provided to inmates, and that although Plaintiff is no longer housed at LCI, it is his understanding that Plaintiff was seen on multiple occasions and received appropriate medical while at LCI. Davis attests that at no time did he take any action to deny the Plaintiff proper medical care. See generally, Davis Affidavit.

The Defendant Robert Stevenson has submitted an affidavit wherein he attests that he is the Warden at BRCI, where he is responsible for the overall operation of the institution. Stevenson attests that he estimates he receives an average of forty or more inmate Requests to Staff per day, and that it is also not uncommon for him to speak with twenty to thirty or more inmates in one day while he is walking through areas of the prison. Stevenson attests that while it is possible that he spoke with the Plaintiff, he has no specific recollection of speaking with him concerning the medical care he was being provided. However, Stevenson attests that inmates do routinely speak to him about issues related to their medical care, and that if an inmate has an obvious medical emergency he would take immediate action, but otherwise he instructs the inmate to sign up for sick call. Further, if he receives a Request to Staff from an inmate or speaks to an inmate concerning his medical care, he generally refers them to the medical department. Stevenson attests that he does not have any advanced medical training and relies on the expertise of the trained medical personnel to provide medical care to inmates, and he does not overrule the medical judgments of the trained

14



medical personnel concerning the medical treatment provided to inmates.  Stevenson attests that at no time did he take any action to deny the Plaintiff proper medical care, and that it is his understanding that Plaintiff was seen on multiple occasions and received appropriate medical care while at BCI.  See generally, Stevenson Affidavit.

Finally, Defendants have submitted an authenticated copy of Plaintiff's medical records.  These medical records show frequent visits by Plaintiff to the medical clinic for a variety of medical complaints, often times on a weekly or even daily basis.  Specifically with respect to Plaintiff's hand injury, Plaintiff's medical records reflect that on January 31, 2013 (six days after Plaintiff alleges he hurt his hand), an Officer "Fox" called the medical clinic to report that Plaintiff was stating that his hand was hurting real bad with possible bleeding, and that she would call medical back with more detail once she had observed him.  Fox was told that if Plaintiff's hand looked bad or disfigured, she was to bring him over to medical.  Plaintiff was then escorted to medical the following day, where he reported he had hit a window approximately one week ago. Plaintiff further advised medical that his left knuckle had split open and had remained swollen, that it would be okay and then it would start bleeding again.  On examination Plaintiff's left middle lower knuckle was noted to have edema, localized to the knuckle, with an open area in the middle of the knuckle.  Dried blood was noted, but there was no sign of any infection.  Plaintiff was assessed with an abrasion/laceration, and was advised to clean the wound with soap and water, making sure that dirt and foreign bodies had been removed, and to then apply a thin layer of Neosporin ointment with a loose sterile bandage as needed.  The area was cleansed with a wound cleanser, covered, and Plaintiff was put on a schedule for daily dressing changes.  Plaintiff understood his instructions and left medical in stable condition.  Plaintiff returned to the medical clinic later that same day for a dressing change, at which time he advised that his dressing had fallen



off.  The affected area was again cleaned with a wound cleanser, and sterile gauze was applied.

Plaintiff's medical records show that he was again seen in the medical clinic the following day, apparently for mental health issues.  The consult note reflects that Plaintiff's mood/affect was "mildly elevated", and that he was complaining that nothing had been done about his hand.  Plaintiff's left hand had a "split" on the middle knuckle with an open wound, and the entire hand was swollen.  Plaintiff complained that he had "been like this for days & no one is paying any attention to me".  The attending medical provider finished the mental health evaluation, and wrote that they "informed medical staff Ms. Fulton who is going to have [Plaintiff] seen for [followup].  Plaintiff was then seen a few hours later in the medical clinic, where his wound was cleansed with saline.  It was apparent that Plaintiff's wound had been bleeding, as there was "dried blood" on his old dressing.  Plaintiff's knuckle was observed to be swollen with his wound "gaping open".  A small amount of drainage was noted, steri-strips were applied, the hand was bandaged with clean and dry dressing, and Plaintiff was escorted back to his cell.

The following day, February 3, 2013, Plaintiff reported during the "a.m. pill pass" that his wound had an "odor" and that he was in pain.  Plaintiff was provided with a starter pack of Motrin and Augmentin.  Plaintiff was seen the following day in the doctor's clinic for evaluation of his left hand injury, where it was noted that he had a 1.5 centimeter straight laceration on top of his "pi knuckle".  He had full range of motion, and he was advised by the attending physician, Dr. Paul Drago, that it "may take 4 weeks to heal".  Plaintiff's wound was again cleaned and his bandages changed, and he was scheduled for an x-ray of his left hand.  Plaintiff's request for a consult by a neurosurgeon  was disapproved.  Plaintiff was seen later that same day for another dressing change, and it was noted that two steri-strips were used to close the wound due to difficulty with the steri-strips staying on the knuckle. Dermabond was also applied on top of the steri-strips



to aid in adhesion.

Plaintiff was seen again in sick call on February 6, 2013, where his hand was again cleaned, his steri-strips were replaced, and his hand was rebandaged.  No drainage was noted.  Plaintiff's dressing was changed again later that day, which included (apparently per protocol) recleaning and application of new steri-strips.  Plaintiff's medical records show that he was then seen again the next day, February 7, 2013.  His wound was cleaned, it was noted to be "pink and clean" with no signs of infection, and new steri-strips were applied.  This procedure was repeated the next day, February 8, 2013.

When Plaintiff was seen in the medical clinic on February 9, 2013, it was noted that Plaintiff had no dressing on his wound.  There were no signs of infection, the wound area was cleaned, and steri-strips were applied and covered with hypafix tape.  It was noted that Plaintiff tolerated this procedure without discomfort.  This cleaning and rebandaging procedure was again performed the following day, February 10, 2013.

A medical note from February 11, 2013 indicates that "per Lt. Goodman in SMU" officers were unable to bring Plaintiff to the medical unit for a dressing change due to security concerns, although they would "continue to monitor inmate".  The next medical note is from February 14, 2013.  Plaintiff complained during this visit that his dressing had not been changed in two days.  Plaintiff's middle knuckle wound was noted to be approximately one half inch in length and very deep, and had some malodorous "puralent exudate" that came out when the edges were brought together.  It was noted that even though the wound had been steri-stripped and dermabonded, it would not remain closed.  Referral to a physician was recommended to see if sutures were going to be needed to close the wound.  It was noted that Plaintiff was currently on Augmentin.  This clinic note was apparently reviewed by Dr. Drago, who advised wound care to



clean the wound and then apply Eucerin or Vaseline gauze.  There is a subsequent notation from later in the day that the encounter information had been sent to the physician (presumably Dr. Drago) and that it was "not recommended to send [Plaintiff] out".

Another clinic note from later that same day (February 14, 2013) notes that Plaintiff had "new orders for a dressing change", but that he was unable to be extracted from his cell for transport to medical due to security reasons.  This entry notes that Plaintiff was given materials to clean his hand wound and redress it, that it was explained to the Plaintiff how to clean his wound properly, and that Plaintiff verbalized his understanding.  This entry also indicates that Dr. Drago's decision was explained to the Plaintiff, who expressed his dissatisfaction and said that he thought his hand should be sutured or he should be sent to the emergency room.

Plaintiff's medical records reflect that the following day, February 15, 2013, the nurse asked that Plaintiff be brought to the medical clinic for a dressing change, but that the Defendant Lt. Richardson stated he was unable to bring Plaintiff at that time because security was busy with showers and trays, but that they would bring Plaintiff to medical later that day.  A subsequent entry that same day reflects that Richardson advised medical that he was short on staff and the meals were coming shortly, but that he would try to get Plaintiff to medical.  It was indicated that staff would continue to monitor Plaintiff's status.

The next medical entry is from February 17, 2013.  The nurse in medical (Joan Floyd) had been told by Nurse Hubbard, who had seen Plaintiff the previous evening (February 16, 2013) in the SMU, that Plaintiff's middle finger laceration was still not "approximated and with drainage".  Floyd stated that she had "viewed the site", which had "scant tan drainage".  There was 2 to 3 centimeters of "orbital redness" that had "no increased warmth", and the plan was to dress the wound that afternoon as two officers would be needed.  She also indicated that she would schedule



Plaintiff to be seen by the physician. There is a further note from that same day indicating that Plaintiff's hand had been "cleansed with wound cleanser", and that padding was applied. Plaintiff was noted to be in no acute distress, and he was instructed to report any increased drainage. There is a note from Dr. Drago a few minutes later instructing Nurse Floyd not to clean the hand with wound cleanser, but to pour "H2O2 into the wound and then use a sterile Q-tip".

Plaintiff was seen the following day in the SMU by Nurse Natasha Marrow, as officers were unable to take Plaintiff to the medical unit for his dressing change due to staffing issues. Minimal drainage was noted, with minimal swelling around the wound area. Plaintiff had full range of motion in his fingers. Plaintiff complained of increased pain in his left hand and requested additional pain medication be ordered, noting that he had been taking a lot of Motrin. Plaintiff's wound was irrigated and secured with hypafix. Plaintiff was instructed to take Ibuprofen, but indicated that he wanted something stronger. Nurse Marrow noted that Plaintiff was in no acute distress, and that she had informed him that he had been seen by the physician, that the physician was aware of the status of his hand, and that he should allow more time for healing.

Plaintiff was seen again in medical the following day for his daily bandage change. It was noted that his dressing had been disturbed and that Plaintiff was instructed to leave the dressing on his hand and to not take it off so as not to introduce infection. The wound was noted to have a purulent white drainage inside it, it was cleaned and flushed, a Vaseline gauze was placed over the wound, followed by a sterile gauze, which was then secured with hypofix and Kerlix. This encounter note indicates that Plaintiff complained that his wound was not being treated correctly, and was insisting on seeing the physician. Plaintiff's medical records show that this medical entry was reviewed by Dr. John McRee, who stated that he agreed with the treatment plan.

Plaintiff's wound was cleaned again on February 21, 2013 (twice). The first entry



on that day indicates that when Plaintiff arrived in medical he again had no dressing on his wound. The notation indicates that Plaintiff told the nurse that another nurse had told him to take his dirty dressing off and wash his hand every hour to keep the germs out of the wound. It was noted that Plaintiff's knuckle had some redness on the outer edge of the wound, but had no active drainage and no foul odor was noted. Plaintiff returned to the medical clinic the following day for another dressing change, during which Plaintiff complained that his wound was not getting any better and again stated that he wanted to see the doctor. During his dressing change the next day, February 23, 2013, Plaintiff again stated he wanted to be assessed by a physician.

Plaintiff was seen in the "mental health clinic" on February 25, 2013, where his medication regimen for his mental health issues were addressed. Plaintiff also complained during this visit about how his legal mail was being handled, and again complained that his hand wound was not healing or getting any better. Plaintiff was then seen in the medical clinic that same day for a dressing change, during which his wound was cleansed and covered with sterile gauzes and secured in place with hypofix tape.

When Plaintiff was seen in the medical clinic the following day, he again did not have any dressing on his wound. Plaintiff said that he had taken his dressing off because it had a large amount of blood on it. On examination Plaintiff's wounds was found to have a 'scant' amount of yellowish drainage, with no active drainage, or foul odor. A cultivation was obtained from the wound area, and his wound was cleaned and rebandaged. The wound culture was forwarded to the lab for analysis.

On February 28, 2013, Plaintiff refused to have his dressing changed, stating "I'm good". Plaintiff did, however, go to his evaluation in the mental health clinic that day. When Plaintiff was then seen again at sick call on March 3, 2013, his knuckle was noted to be "scabbed



over" with no drainage. This encounter note indicates that Plaintiff did not want a dressing, and that he did not need one since his wound had scabbed over. Plaintiff was provided with some ointment and a band-aid in case his wound did begin to drain, and he was instructed to keep his hand washed. The nurse indicated that Plaintiff no longer needed daily bandage changes at that time, a conclusion which was signed off on by Dr. Thomas Byrne.

Plaintiff's medical records reflect that on March 4, 2013 the culture swab came back from the lab with a positive finding for "staphy MRSA". Dr. Byrne noted that Plaintiff's wound had been "scabbed over" when checked the previous day, and instructed that it be rechecked on the 6th. Plaintiff was placed on the "scheduling needs" list that same day, but was not seen until March 8, 2013. At that time it was noted that Plaintiff's "entire left hand [was] red and swollen, and that it had a "slight amount" of drainage. The attending provider indicated that they would defer to the physician on whether Plaintiff needed a daily dressing change. Three separate physicians then signed off on Plaintiff having daily dressing changes for the next week, and that he was to be given Clindamycin and Septra for his staph infection.[5] A subsequent note indicated that Plaintiff had been added to the daily dressing changes list in the pill room.

Plaintiff was next seen in the medical clinic on March 12, 2013, where it was noted that Plaintiff had an "old healed approx 3 cm long incision laceration to top of hand that he states was a result of his hitting door". An x-ray was to be obtained, and Plaintiff was continued on his medications as previously ordered. Plaintiff was seen twice for dressing changes over the next 48 hours, during which a scant amount of green/yellow drainage was noted, with Plaintiff stating that he was currently taking antibiotics. However, on March 16, 2013, Plaintiff's hand, wrist, and arm

---

[5]Clindamycin and Septra are antibiotics used to treat serious infection caused by bacteria. http://www.drugs.com.



were noted to be swollen, with the wound area being "very tender to touch". Plaintiff stated he was going to go on a hunger strike if he was not seen by a doctor or nurse practitioner. Dr. Thomas Byrne told the provider to send Plaintiff's examination notes to Palmetto Richland Memorial Hospital, apparently to be reviewed. Although Plaintiff remained on antibiotics and was having his dressing changed daily, the following day his left hand and lower arm were still swollen, so Plaintiff was given an injection of Rocephin.[6]

Plaintiff's condition did not improve, and on March 18, 2013 he was taken to Palmetto Richland Memorial Hospital. An entry was made referencing the x-ray Plaintiff had had on his hand on March 14, 2013 which showed soft tissue swelling and soft tissue foreign body over the dorsum of the hand at the level of the third metacarpal, with no new fractures, as well as an old, well healed fifth metacarpal fracture. Plaintiff was diagnosed with left hand cellulitis, and returned to the Lee Correctional Institution from Palmetto Richland. It was noted that Plaintiff had injured his hand approximately two month previous, and that over the course of the past two months the condition of his hand would "wax and wane" even though it had been treated with antibiotics as well as injections of Rocephin. It was further noted that Plaintiff's hand had been getting better versus worse, but then presented to Palmetto Health Richland with a diffusely swollen hand and erythema. The attending physician (Dr. David Koon) noted that there did not appear to be any fluctuant mass, there was a metallic foreign body that was present in the dorsum of his hand, and a small wound over the dorsum just proximal to the MCP joint. Plaintiff was placed on an i.v. antibiotic, following which his "white count" was reduced. Dr. Koon noted that Plaintiff's pain was being controlled with medication, and that he was stable for discharge back to the SCDC. Discharge instructions

---

[6]Rocephin is an antibiotic used to treat bacterial infections, including life-threatening forms of meningitis. http://www.drugs.com/search.php?searchterm=Rocephin



were that Plaintiff continue to keep his hand clean and dry, that he could wear a velcro splint, and that he should followup with USC Orthopedics in one week for a hand recheck.  On March 23, 2013, Plaintiff had his left hand x-rayed, which showed soft tissue swelling and soft tissue foreign body over the dorsum of the hand at the level of the medicarpal, no new fractures, and an old well healed fracture.  Dr. Byrne note that Plaintiff had been seen by Palmetto Richland, and that he had an appointment scheduled with USC Orthopedics scheduled for April 3, 2013.

On March 28, 2013 Plaintiff's left hand was noted to be edematous but non-pitting, it did not feel warm to the touch, he had good capillary refills in all fingers, and his wound was noted to be scabbed over with no drainage and no open areas noted.  However, Plaintiff claimed to be unable to use his left hand and denied the ability to use his fingers or his left wrist.  Plaintiff also was requesting to be placed back on Percocet.  Dr. Benjamin Lewis instructed that Plaintiff be seen in the medical clinic, although he was actually seen later that same day due to his being transferred to the Broad River Correctional Institution.  Plaintiff told the provider at Broad River about the history of his hand injury and said that he had been told that if the infection in his hand returned, that the piece of metal in his hand would need to be removed.

Plaintiff was seen in the mental health clinic the following day where various mental health issues were noted as well as Plaintiff's medications.  Plaintiff continued to complain about his left hand and that it was hurting.  Plaintiff was seen in the doctor's clinic on April 4, 2013, where examination of his left hand revealed "mild swelling, tender to touch, no erythema".  On April 11, 2013, Plaintiff was seen in the doctor's clinic for complaints of pain, including decreased function in his fingers due to pain.  Plaintiff was able to grasp two fingers but said it was painful to do so, and claimed that he was unable to spread his fingers or make a fist.  On examination his left hand was found to have no erythema, with the mild swelling that had been noted on his last visit being now



significantly improved.  There was a slight deformity noted over the dorsal area, where he had a well healed scar on the dorsum of his third metacarpal area.  There was no sign of infections, and it was noted that there was no indication for therapy at that time.  Plaintiff was scheduled to be seen by "ortho" on April 18, 2013.  A repeat x-ray was also ordered to be sent to ortho.

Records from Plaintiff's hospital visit to Palmetto Richland Medical were reviewed, with the notation that an x-ray had revealed a foreign body but there was no indication in the record for removal of the foreign object.  Plaintiff was continued on his pain medication, and he was to be seen by ortho for possible removal of the foreign body.  When Plaintiff returned from the orthopedic clinic, it was with a recommendation that clearance be obtained for surgery to remove the foreign body from Plaintiff's hand.  That surgery was then performed on April 19, 2013, and Plaintiff was returned to the prison with instructions to have his wound rechecked on April 22, 2013.  When Plaintiff arrived at Broad River, his left hand dressing was intact, there was no swelling noted, he took his medications as prescribed, and voiced no complaints.  Plaintiff's hand thereafter continued to improve.  By April 25, 2013, there was no swelling noted, Plaintiff was able to move all of his fingers, he had good capillary refill, and his left hand was warm with good color.  Plaintiff thereafter continued to be seen by medical personnel at the prison for followup as well as a variety of other complaints.  See generally, SCDC Health Services Medical Summaries.

As additional medical records, the Defendants have also provided copies of records of Plaintiff's medication services, lab reports, physician transfer notes and consultation notes, as well as medical records from Palmetto Health Richland.  See generally, Defendants' Exhibits (Medical Records).

As an attachment to his response to the Defendants' motion for summary judgment, Plaintiff has provided two photographs of his hands (undated), which show a small cut or wound



on his left hand with some swelling. Plaintiff has also provided an affidavit from another inmate, George Salisbery, who attests that he heard the Plaintiff on "numerous occasions . . . begging and pleading with medical staff and security staff" to help him get proper medical treatment for his hand. Salisbery also attests that, on one occassion, he heard the Defendant Richardson tell Plaintiff "you will be alright, toughen up, take it like a man". Salisbery attests that he heard the Plaintiff tell both the Defendants McCall and Davis when they were "coming around" about his hand and requesting proper medical treatment. Salisbery attest that both McCall and Davis told Plaintiff that they would get in contact with medical and get him some help, but that "medical attention still never came". Salisbery further attests that he saw Plaintiff's hand, which was swollen, and that Plaintiff routinely complained to him about the pain [he] was in, and that they had even contacted Salisbery's sister to see if she could call medical and try to get something done. See generally, Salisbery Affidavit.

### Discussion

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. The moving party has the burden of proving that judgment on the pleadings is appropriate. Once the moving party makes this showing, however, the opposing party must respond to the motion with "specific facts showing there is a genuine issue for trial." Rule 56(e), Fed.R.Civ.P. Further, while the Federal Court is charged with liberally construing a complaint filed by a pro se litigant to allow the development of a potentially meritorious case, see Cruz v. Beto, 405 U.S. 319 (1972); Haines v. Kerner, 404 U.S. 519 (1972), the requirement of liberal construction does not mean that the Court can ignore a clear failure in the pleadings to allege facts which set forth a Federal claim, nor can the Court assume the existence of



a genuine issue of material fact where none exists. Weller v. Dep't of Social Services, 901 F.2d 387 (4th Cir. 1990). Here, after careful review of the arguments and evidence presented, the undersigned finds and concludes for the reasons set forth hereinbelow that the Defendants' motion should be granted, and that this case should be dismissed.

In order to proceed with a claim for denial of medical care as a constitutional violation, Plaintiff must present evidence sufficient to create a genuine issue of fact as to whether any named Defendant was deliberately indifferent to his serious medical needs. Estelle v. Gamble, 429 U.S. 97, 106 (1976); Farmer v. Brennen, 511 U.S. 825, 837 (1994); Sosebee v. Murphy, 797 F.2d 179 (4th Cir. 1986); Wester v. Jones, 554 F.2d 1285 (4th Cir. 1977); Russell v. Sheffer, 528 F.2d 318 (4th Cir. 1975); Belcher v. Oliver, 898 F.2d 32 (4th Cir. 1990). Plaintiff has failed to submit any such evidence. Rather, the evidence before this Court, including the various affidavits from Plaintiff's medical professionals, Plaintiff's medical records, as well as Plaintiff's own statements in his filings and exhibits, shows that Plaintiff received continuous and ongoing treatment for his medical complaints. He was regularly seen by nurses and nurse practitioners, he was seen by (and his file was reviewed by) several physicians, and he was even approved for (and received) outside surgery. Plaintiff also receive at least two (2) x-rays, antibiotics and other medications. While Plaintiff obviously disagrees with the course of his medical care, and believes the medical professionals as well as prison officials did not care or were indifferent about his condition, none of the voluminous medical evidence provided to this Court shows that any named Defendant, or any other medical personnel, were deliberately indifferent to Plaintiff's serious medical needs. Levy v. State of Ill. Dept. of Corrections, No. 96-4705, 1997 WL 112833 (N.D.Ill. March 11, 1997) ["A defendant acts with deliberate indifference only if he or she 'knows of and disregards' an excessive risk to inmate health or safety.'"], quoting Farmer, 511 U.S. at 837; House v. New Castle County,



824 F.Supp. 477, 485 (D.Md. 1993) [Plaintiff's conclusory allegations insufficient to maintain claim].[7]

Plaintiff's complaint is quite simply that he was primarily seen by nurses or nurse practitioners when he wanted to be seen by a physician, and that he wanted to have a different course of treatment prescribed for him even though he was on antibiotics and the medical personnel who examined him had determined, based on the results of their examinations or review of the consult notes, that Plaintiff was receiving the proper course of treatment for his injury. The medical

_____

[7]Further, with respect to the Defendants McCall, Davis and Stephenson, while public officials are subject to monetary damages under § 1983 in their individual capacities, the doctrines of vicarious liability and respondeat superior are not applicable in § 1983 cases. See Vinnedge v. Gibbs, 550 F.2d 926, 927-929 & nn. 1-2 (4th Cir. 1977). There is no evidence to show that any of these three Defendants were responsible for Plaintiff's medical care. They are not physicians, and cannot be held liable for any medical decisions made by any of the prison medical personnel just because they are employees of the prison. Supervisory officials may be held liable in a § 1983 action only for an official policy or custom for which they are responsible and which resulted in illegal action. See generally, Monell v. Dep't of Social Servs., 436 U.S. 658, 694 (1978); Wetherington v. Phillips, 380 F.Supp. 426, 428-429 (E.D.N.C. 1974), aff'd, 526 F.2d 591 (4th Cir. 1975); Joyner v. Abbott Laboratories, 674 F.Supp. 185, 191 (E.D.N.C. 1987); Stubb v. Hunter, 806 F.Supp. 81, 82-83 (D.S.C. 1992); See Slakan v. Porter, 737 F.2d 368, 375-376 (4th Cir. 1984), cert. denied, Reed v. Slakan, 470 U.S. 1035 (1985); Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994), cert. denied, 115 S.Ct. 67 (1994); Fisher v. Washington Metro Area Transit Authority, 690 F.2d 1133, 1142-1143 (4th Cir. 1982) (citing Hall v. Tawney, 621 F.2d 607 (4th Cir. 1980)). No such policy or custom is alleged here. Rather, Plaintiff's complaint is that the medical personnel involved in his case did not make (in his opinion) the proper medical decisions about what should be done about his hand injury. See, discussion hereinabove, supra and infra. These officials, as well as the Defendant Richardson (a prison guard), were entitled to rely on the judgment and decisions made by the medical professionals who saw the Plaintiff with respect to Plaintiff's medical care. Cf. Shakka v. Smith, 71 F.3d 162, 167 (4th Cir. 1995) [officials entitled to rely on judgment of medical personnel]; Miltier v. Beorn, 896 F.2d 848, 854 (4th Cir. 1990) [officials entitled to rely on expertise of medical personnel]. Additionally, Plaintiff has failed to show that any delays in treatment occasioned by staff shortages shown in the record resulted in any constitutional violation. Hill v. Dekalb Regional Youth Detention Center, 40 F.3d 1176, 1188-1189 (11th Cir. 1994)["An inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed"], overruled in part by Hope v. Pelzer, 536 U.S. 730, 739 n. 9 (2002). Hence, even if the Court were to find that Plaintiff's claims against the named medical Defendants are sufficient to survive summary judgment, McCall, Davis, Stevenson, and Richardson would be entitled to dismissal as party Defendants.



professionals involved in Plaintiff's case evaluated Plaintiff's condition and rendered a judgment as to the type of care and treatment warranted based on their professional experience and judgment, and Plaintiff's mere lay disagreement with the opinions or diagnoses of these medical professionals, without any contrary *medical* evidence to show that any medical professional violated the requisite standard of care for his complaints, is not sufficient to maintain a §1983 deliberate indifference lawsuit. See Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985)[Disagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim absent exceptional circumstances]; Scheckells v. Goord, 423 F.Supp. 2d 342, 348 (S.D.N.Y. 2006) (citing O'Connor v. Pierson, 426 F.3d 187, 202 (2d Cir. 2005) ["Lay people are not qualified to determine...medical fitness, whether physical or mental; that is what independent medical experts are for."]).

Even assuming Plaintiff's allegation in his Complaint that security had called medical about his injury prior to January 31, 2013 (which is when the documentary and testimonial evidence submitted by the Defendants shows they were first notified) to be true for purposes of summary judgment, that does not establish a constitutional claim. Plaintiff has presented no evidence, by way of medical records or findings or testimony from a medical professional, to show that any delay of a few days before he was seen in medical resulted in the medical problems Plaintiff has experienced with his injury. Hill, 40 F.3d at 1188-1189 ["An inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed"], overruled in part by Hope, 536 U.S. at 739 n. 9. Plaintiff cannot simply allege in a conclusory fashion that he did not receive constitutionally adequate medical care or attention, otherwise provide no supporting evidence, and expect to survive summary judgment, particularly when the Defendants have submitted voluminous medical documents and testimonial evidence showing that Plaintiff was



regularly seen and evaluated by medical personnel for his complaints and which refute Plaintiff's claims. Green v. Senkowski, 100 Fed.Appx. 45 (2d Cir. 2004) (unpublished opinion) [finding that plaintiff's self-diagnosis without any medical evidence insufficient to defeat summary judgment on deliberate indifference claim]; Morgan v. Church's Fried Chicken, 829 F.2d 10, 12 (6th Cir. 1987) ["Even though pro se litigants are held to less stringent pleading standards than attorneys the court is not required to 'accept as true legal conclusions or unwarranted factual inferences.'"]; Levy, No. 96-4705, 1997 WL 112833 ["A defendant acts with deliberate indifference only if he or she 'knows of and disregards' an excessive risk to inmate health or safety.'"].

Plaintiff may, of course, pursue a claim in state court if he believes that the medical care provided to him constitutes malpractice. However, that is not the issue before this Court. Estelle v. Gamble, 429 U.S. 97, 106 (1976)["medical malpractice does not become a constitutional violation merely because the victim is a prisoner."]. The evidence before the Court is insufficient to raise a genuine issue of fact as to whether any named Defendant was deliberately indifferent to Plaintiff's serious medical needs, the standard for a constitutional claim, and Plaintiff's federal § 1983 medical claim should therefore be dismissed. See DeShaney v. Winnebago County Dep't of Social Servs., 489 U.S. 189, 200-203 (1989) [§ 1983 does not impose liability for violations of duties of care arising under state law]; Baker v. McClellan, 443 U.S. 137, 146 (1976) [§ 1983 claim does not lie for violation of state law duty of care]; Estelle, 429 U.S. at 106 ["medical malpractice does not become a constitutional violation merely because the victim is a prisoner."].

## Conclusion

Based on the foregoing, it is recommended that the Defendants' motion for summary judgment be **granted**, and that this case be **dismissed**.



The parties are referred to the Notice Page attached hereto.

_____
Bristow Marchant
United States Magistrate Judge

January 30, 2015
Charleston, South Carolina



**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.  "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'"  *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d).  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
Post Office Box 835
Charleston, South Carolina 29402

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

